IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS GULLICK,

                                      OPINION AND ORDER

              Plaintiff,

                                        06-C-707-C

      v.

TERRY OTT (in his individual capacity),

              Defendant.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The facts of this case sound like they came straight from a bad movie on cable tv:  a contentious county election, a mysterious traffic stop on a country road and competing allegations of politically motivated retaliation and public urination.  The story begins in the middle of a campaign for Columbia County sheriff in the summer of 2006.  Plaintiff Thomas

---

[1]  In his complaint and subsequent filings, plaintiff names a second defendant, "ABC Insurance Company," in the caption.  Inexplicably, defendant Ott has replaced that name with "Wisconsin County Mutual Insurance Company" in all of his filings since his answer. I have omitted either name from the caption because defendant Ott is the only defendant plaintiff has served with the complaint and therefore he is the only defendant in this case. Fed. R. Civ. P. 4.  In any event, a defendant's insurance company is not a proper party in a case brought pursuant to 42 U.S.C. § 1983.  Wagner v. Washington County, 493 F.3d 833, 836 (7th Cir. 2007).

Gullick was an avid supporter of one of the candidates, Roger Bradner, and disliked by supporters of another candidate, Dennis Richards.  Defendant Terry Ott, a Columbia County deputy sheriff, was a Richards supporter.

On August 3, 2006, defendant observed plaintiff's parked car on the side of a road outside Columbus, Wisconsin.   After defendant saw plaintiff near a Richards sign and noticed plaintiff had a Bradner sign in his car, defendant stopped plaintiff and began to ask him questions.  More than an hour later, defendant allowed plaintiff to leave, after issuing a citation to him for public urination and searching his car for "negative" fliers.  The parties dispute much of what happened in between.  Defendant says that plaintiff admitted to urinating near the Richards sign.  Plaintiff says he was only checking to see whether the sign was placed illegally (it was) and that defendant continued to hold him without justification, despite his repeated pleas to use the restroom.  (Plaintiff has a medical condition requiring him to urinate frequently.)  The Columbia County district attorney later dismissed the citation.

In this lawsuit brought pursuant to 42 U.S.C. § 1983, plaintiff alleges that defendant detained him and issued the citation because of plaintiff's support for Bradner in the sheriff's race, in violation of the First Amendment.  Defendant has moved for summary judgment, raising four issues:

- whether plaintiff must prove the absence of probable cause to maintain a First

2

Amendment retaliation claim against defendant and whether defendant had probable cause to issue plaintiff a citation for public urination;

•       whether plaintiff has adduced sufficient evidence that defendant detained him and issued a citation because of plaintiff's support for a particular candidate;

•       whether defendant's actions were sufficiently "adverse" to constitute retaliation under the First Amendment; and

•       whether defendant is entitled to qualified immunity.

For the reasons discussed below, I find in favor of plaintiff on each of these issues. Accordingly, I will deny defendant's motion for summary judgment.

From the parties' proposed findings of fact and the record, I find the following facts to be undisputed for the purpose of defendant's motion for summary judgment.

## UNDISPUTED FACTS

### A.   2006 Campaign for Columbia County Sheriff

In spring 2006, the sheriff of Columbia County, Wisconsin, Steven Rowe, decided not to run for reelection. Among the candidates competing to take Rowe's place were Dennis Richards and Roger Bradner, both of whom were officers in the sheriff's department and members of the Republican party.

Plaintiff Thomas Gullick, a retired naval officer, supported Bradner because Bradner

3

had a political science degree and a reputation for honesty.  Plaintiff believed that Richards was "uneducated" and had a reputation for being a "good ole boy."

Plaintiff was "actively involved" in Bradner's campaign.  This included circulating nomination papers, distributing campaign literature, putting up signs and using his car to drive Bradner around in a parade.  Plaintiff was well known by members of Richards's campaign, some of whom believed that plaintiff was "mean and nasty" and did "dirty work" for Bradner.  In addition, they took pictures of plaintiff at public events to prove the extent of his association with Bradner.

Defendant Terry Ott, a Columbia County deputy sheriff, supported Richards.  Defendant signed Richards's nomination papers, posted three signs for Richards in his yard, made a $25 donation and attended a Richards fundraiser.  Defendant knew plaintiff, knew that plaintiff was "very political in nature" and knew that he was one of Bradner's supporters.

The campaign leading up to the Republican primary was "heated."  Because both candidates were sheriff's deputies, many Columbia County officers had strong feelings about one candidate or the other.

At the end of July 2006, plaintiff went to a fair on behalf of Bradner.  Another Columbia County officer, Dan Garrigan, told plaintiff to "look out for" defendant. Garrigan said that Ott was a strong supporter of defendant and would not treat plaintiff fairly if they

4

had a dispute.

B. <u>The Citation</u>

On the morning of August 3, 2006, plaintiff was driving westbound on Highway 60/16 outside Columbus, Wisconsin.  He pulled off the road and parked his car.  (The parties dispute why plaintiff pulled over.  Plaintiff says it was to make a call on his cellular phone; defendant says it was to urinate.)

While defendant was patrolling the highway in a marked squad car, he saw plaintiff's parked car.  After defendant saw plaintiff near a sign that said "Richards for Sheriff," defendant turned on his flashing lights.  Defendant parked and walked toward plaintiff, who was now in his parked car.   When defendant reached plaintiff's car window, he saw a sign in the car that said "Bradner for Sheriff."

Plaintiff complied when defendant asked for plaintiff's driver's license.  (The parties dispute what plaintiff said to defendant.  Defendant's version is that plaintiff told defendant that he went near the sign to urinate.  Plaintiff says he told defendant that he saw the sign after he parked and was trying to determine whether it had been placed illegally on a public right of way.  As it turns out, plaintiff was right; the sign should not have been there.)  Defendant asked plaintiff to wait in his car while defendant "looked around."  Defendant did not examine the area around the sign to determine whether plaintiff had urinated there.

5

Defendant contacted the Columbia County sheriff's dispatch center. After identifying plaintiff to dispatch, he stated that "subject said he was relieving himself here in cornfield." In addition, defendant said, "I've got a political sign that is bent over onto the ground." (Apparently, defendant suspected that plaintiff had damaged one of Richards's signs, in violation of a Wisconsin statute. However, he did not see plaintiff damage the sign or issue plaintiff a citation for that offense, or for trespassing, another offense defendant says he suspected plaintiff of committing. When defendant's supervisor later visited the scene of the incident, he could not find any damage to the sign, with the exception that one post "had a slight bend to it." In addition, he concluded that plaintiff had not been trespassing.)

While plaintiff was still waiting in his car, defendant sent text messages on his mobile computer to Randy Martin (the police chief for Rio, Wisconsin) and Max Jenatschenk, a deputy for Columbia County. Jenatschenk wrote that plaintiff was "a political fanatic" and wanted defendant to call him. Defendant responded that his cell phone was dead and that he was looking for the statute on public urination.

Martin wrote, "Terry, I had a call about those negative fliers in Rio. Is your suspect in possession of any [of the] fliers in question?" Defendant wrote back, "I'll have to get consent." (Martin was "an active and vocal" Richards supporter, which defendant knew. Martin believed that plaintiff had been placing "anti-Richards" fliers in mailboxes.)

While the stop was ongoing, Richards called his campaign manager, Steven Sarbacker,

6

to tell him plaintiff had been caught "peeing on a sign or bending a sign."  Sarbacker responded that "they finally caught" plaintiff.

Eventually, defendant returned to plaintiff's car and gave him a citation for public urination, which is an ordinance violation and a forfeiture punishable by fine only. Defendant told plaintiff he was free to go, but before plaintiff could leave, defendant asked plaintiff for consent to search his car.  Plaintiff agreed and defendant searched plaintiff's trunk and passenger compartment, including under the seats and in a "wet-wipe" container. Defendant did not find any fliers, but he did find medication in an unmarked bottle, which he confiscated.  Later, it was determined the bottle contained medication for acidic stomach problems.  (In his police report, defendant wrote that he was looking for the fliers as "evidence to support [his] case of criminal damage to a political sign.")

Defendant knew that plaintiff suffered from a medical condition causing him to have sudden and frequent urges to urinate.  (The parties dispute whether plaintiff had a strong urge to urinate during the stop; whether he told defendant this and asked defendant as many as ten times whether he could leave to use the restroom; whether defendant told plaintiff each time that he could not do so, including one time that plaintiff asked after defendant told him he was free to leave; whether at least once defendant spoke to plaintiff "abusively" when plaintiff made the request; and whether plaintiff wet himself as a result of being unable to use the restroom.)

7

The stop lasted approximately one hour, from 11:38 a.m. to 12:46 p.m.

After the stop, defendant prepared a report for the Columbia County district attorney about a belief that plaintiff had damaged the sign.

### C.  Plaintiff's Complaint with the Sheriff's Office

The same day, plaintiff filed a complaint with the Columbia County sheriff's office about defendant's treatment of him.  Darrel Kuhl, a captain at the sheriff's office and defendant's supervisor, investigated the complaint.

When Kuhl asked defendant why the stop took so long, he told Kuhl that he wanted to be "thorough."  Defendant thought that "problems" with the stop might arise because he supported Richards and plaintiff supported Bradner.  Kuhl told defendant that the length of the stop was "far too long" for the amount of investigation he conducted.  Kuhl emphasized to defendant "how poorly he followed-up on" his suspicions and that he "did not understand how a deputy with [defendant's] tenure could not complete basic follow up."

Kuhl also expressed a concern to defendant that Richards knew about defendant's stop of plaintiff while it was still happening.  Kuhl told defendant that "somebody in the Sheriff's Office or another jurisdiction must have been contacting" Richards.  When defendant said that anyone "could have heard it on the scanner," Kuhl pointed out that even if a member of the public had been listening, it was "extremely unlikely to almost

8

impossible" that a member of the public would have known that a Richards sign was involved and would have called the Richards campaign immediately to tell them about the incident.

Kuhl concluded that defendant had violated Columbia County Sheriff's Office policies regarding inattention to duty and incompetency or inefficiency in the performance of duty. Kuhl gave defendant a letter of reprimand for his handling of the stop, but that letter was later withdrawn and replaced with "a coaching letter."

### D.  Later Events

The Portage Daily Register printed two articles about plaintiff's public urination charge. Bradner asked plaintiff to cease all involvement with his campaign, in part because of plaintiff's incident with defendant.

The Columbia County district attorney referred defendant's allegation of damage to property to the Dodge County district attorney, who declined to prosecute plaintiff. The Circuit Court for Columbia County, Wisconsin dismissed the public urination charge on the motion of the Columbia County district attorney.

Richards defeated Bradner in the primary and ultimately won the general election for Columbia County sheriff.

OPINION

A.  Evidentiary Framework for Retaliation Claims against Police Officers

Normally, a claim of retaliation under the First Amendment follows a straightforward analysis:  did the plaintiff engage in conduct protected by the Constitution; if so, can the plaintiff show that the defendant was motivated to take an adverse action against the plaintiff because of the protected conduct; and, if so, can the defendant show that he would have taken the same action, even if the plaintiff had not exercised a constitutional right? Mt. Healthy Board of Education v. Doyle, 429 U.S. 274, 287 (1977).

The parties agree that supporting a particular political candidate is activity protected by the First Amendment right of association.  Elrod v. Burns, 427 U.S. 347, 356 (1976); Newcomb v. Brennan, 558 F.2d 825, 829 (7th Cir. 1977) (expressing [one's] political views, without interference from state officials . . . lies at the core of the values protected by the First Amendment").  However, defendant raises two questions about the application of the Mt. Healthy framework to this case.


1.  Does Mt. Healthy apply at all?

First, defendant says that "[n]either the [Court of Appeals for the] Seventh Circuit [n]or the Supreme Court has set forth a definitive test for evaluating First Amendment claims that do not arise out of employment or contractual settings."  Dkt. #22, at 3.  This

10

observation is not necessarily accurate.  Although the court of appeals may have never held explicitly that the Mt. Healthy standard applies outside the employment context, it has certainly assumed without question in a number of cases that it does apply in variety of settings unrelated to employment, including retaliatory arrest.  Morfin v. City of East Chicago, 349 F.3d 989, 1005 (7th Cir. 2003); see also Babcock v. White, 102 F.3d 267 (7th Cir. 1996) (retaliation by prison officials).

Defendant does not offer any reason to believe that the ordinary framework would not apply to all First Amendment retaliation claims and I do not see one.  In fact, despite his questioning of it, defendant employs the Mt. Healthy standard in his brief, as does plaintiff.  I will do the same.

2.  Must plaintiff prove the absence of probable cause?

Defendant raises a second issue about the framework, which is whether an additional element exists in a case like this one challenging the issuance of a citation.  Defendant argues that plaintiff cannot prevail unless he can prove that defendant did not have probable cause for the detention and citation.  Presumably, defendant's theory is that any objective basis for his actions should trump any unconstitutional motive he may have had.

As a general proposition, the court of appeals has rejected defendant's argument. Generally, it makes no difference whether the defendant *could have* taken an adverse action

11

against the plaintiff for a legitimate reason.  If the *actual* reason was the plaintiff's exercise of a constitutional right, the defendant may be held liable for retaliation under § 1983. Vukadinovich v. Board of School Trustees of North Newton School Corp., 278 F.3d 693, 699 (7th Cir. 2002). See also Crawford-El v. Britton, 523 U.S. 574, 577, 594 (1998) (in First Amendment retaliation case, rejecting "proposal to immunize all officials whose conduct is 'objectively valid,' regardless of improper intent"); Balderston v. Fairbanks Morse Engine Division of Coltec Industries, 328 F.3d 309, 323 (7th Cir. 2003) (in discrimination case, refusing to consider alleged deficiencies of plaintiff when there was no evidence that those deficiencies actually influenced decision maker in terminating plaintiff).

As will be discussed further below, in almost every case involving retaliation, the defendant advances an objective reason for taking the adverse action against the plaintiff. Never has the court of appeals suggested that a defendant may avoid liability simply by identifying a theoretical justification for his conduct.  Even in the prison context, where First Amendment rights are at their weakest, the court of appeals has made it clear that motive matters.  E.g., Hasan v. United States Dept. of Labor, 400 F.3d 1001, 1006 (7th Cir. 2005). In other words, an official may not take refuge in a pretextual justification that in fact had nothing to do with his actions.

On its face, this rule makes perfect sense.  If probable cause acts as an absolute bar for any retaliation claim against a police officer, this would provide immunity for even the

most egregious examples of selective enforcement.  And yet, more than 120 years ago, the Supreme Court held that even a statute that is valid on its face may not stand if it is enforced in a discriminatory fashion.  Yick Wo v. Hopkins, 118 U.S. 356 (1886).  Thus, the consequences of accepting defendant's argument are troubling because it would permit unethical officers to target their enemies or critics with a litany of citations for petty violations that would be ignored if committed by anyone else.  Mark A. Edwards, Law and the Parameters of Acceptable Deviance, 97 J. Crim. L. & Criminology 49, 87 (Fall 2006) (arguing that risk of selective enforcement is greatest when conduct is "formally illegal" but within zone of "acceptable deviance," such as driving several miles an hour over speed limit).  If, as the Court has observed, "the Constitution prohibits selective enforcement of the law based on considerations such as race," Whren v. United States, 517 U.S. 806, 813 (1996), it follows that the Constitution equally prohibits selective enforcement because of an exercise of a constitutional right.

This would be the end of the matter but for Hartman v. Moore, 547 U.S. 250 (2006), a case to which defendant points as support for his argument that plaintiff must prove the absence of probable cause.  In Hartman, the Supreme Court concluded that in a claim under the First Amendment for retaliatory *prosecution,* the plaintiff must prove "the absence of probable cause for pressing the underlying criminal charges."  Id. at 257.  If probable cause for the charge exists, the plaintiff may not proceed with the claim.

13

At first look, the holding in <u>Hartman</u> appears to present a bit of a road block for plaintiff.  After all, there are a number of similarities between claims for retaliatory prosecution and retaliatory arrest, suggesting that limitations on a claim for one may apply equally to the other.  If the Court in <u>Hartman</u> had adopted the reasoning the government advanced for placing a heightened burden on plaintiffs, I would agree with defendant that <u>Hartman</u>'s holding applies.  But the Court flatly rejected the government's argument, which was that an "objective" element was necessary to weed out "frivolous" retaliation claims because they are "too easy to claim and too hard to defend against."  <u>Id.</u> at 257-58.

Instead, in an opinion by Justice Souter, the Court went down another path, justifying the additional element on a ground unique to claims involving a prosecutor.  The Court observed that a "retaliatory-prosecution case is different" from other retaliation cases because "the chain of causation" is "more complex" in a "retaliatory-prosecution" case than it is in other cases.  <u>Id.</u> at 261.  In particular, because the prosecutor usually is immune from suit, the plaintiff must assert the claim against another official who he alleges influenced the charging decision.  This means that the plaintiff "must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging."  <u>Id.</u> at 262.

The Court saw this difference as dispositive:

> Herein lies the distinct problem of causation in cases like this one. Evidence

14

of an inspector's animus does not necessarily show that the inspector induced the action of a prosecutor who would not have pressed charges otherwise. Moreover, to the factual difficulty of divining the influence of an investigator or other law enforcement officer upon the prosecutor's mind, there is an added legal obstacle in the longstanding presumption of regularity accorded to prosecutorial decisionmaking. And this presumption that a prosecutor has legitimate grounds for the action he takes is one we do not lightly discard, given our position that judicial intrusion into executive discretion of such high order should be minimal.

Some sort of allegation, then, is needed both to bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action, and to address the presumption of prosecutorial regularity. And at the trial stage, some evidence must link the allegedly retaliatory official to a prosecutor whose action has injured the plaintiff. The connection, to be alleged and shown, is the absence of probable cause.

Id. at 263 (citations omitted).

Hartman is somewhat puzzling in a number of respects, most notably because it is not clear under what authority the Court decided to impose an additional element in one type of retaliation case. Only a few years ago, the Court rejected an argument that it had such authority, instead instructing the parties to take their concerns to Congress if they wished to change the standard of proof in First Amendment retaliation cases. Crawford-El, 523 U.S. at 595 ("our cases demonstrate that questions regarding pleading, discovery, and summary judgment are most frequently and most effectively resolved either by the rulemaking process or the legislative process").

Further, it is not immediately apparent how the Court's conclusion follows from its premise. If it is already more difficult to prove intent in a retaliatory prosecution case

15

because the chain of causation is "more complex," why is it appropriate to impose yet *another* proof requirement that will make success on the claim even more arduous and remote?   The Court does not say, but seems to assume that the answer is self evident.   As a general matter, the Court has held that proof of intent in a civil rights case should not be artificially limited to a particular type of evidence.   Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000).   Yet, in Hartman, the Court held that the only way to prove retaliatory intent (or at least to make a prima facie showing) in a retaliatory prosecution case is to prove the absence of probable cause.   Even if the prosecutor and officers involved admit outright that the plaintiff was chosen for prosecution because of his exercise of a constitutional right, this gets the plaintiff nowhere unless probable cause was lacking.   Hartman, 547 U.S. at 264.

Whatever questions Hartman left unanswered, its holding has no application in this case.   Although a claim alleging the issuance of a "retaliatory citation" may be similar in some respects to a claim for "retaliatory prosecution," plaintiff's claim in this case is more similar to a "typical" retaliation case than it is to the claim in Hartman.   The concerns raised by the Court, a "more complex" chain of causation and a need to address the presumption of prosecutorial regularity, are not implicated when no prosecutor is involved in the claim and when the named defendant is directly responsible for the plaintiff's alleged injuries, as in this case.

16

Defendant cites no authority requiring a different conclusion.  Before Hartman, the Court of Appeals for the Seventh Circuit had not decided the question whether the existence of probable cause could bar a First Amendment retaliation claim against a police officer. Abrams v. Walker, 307 F.3d 650, 657 (7th Cir. 2002) (declining to address issue).  And since Hartman, the court of appeals has not considered that case's scope.  However, defendant cites two cases that applied the Hartman rule even when no prosecutor was involved.  The first case involved an allegation that the mayor had induced various police officers to issue 25 citations to the plaintiff.  Williams v. City of Carl Junction, Missouri, 480 F.3d 871, 876 (8th Cir. 2007).  Thus, Williams is not instructive because it "raise[d] the same complications as those described in Hartman" regarding causation, namely multiple levels of decision makers.  Id.

The second case involved an allegation that police officers had themselves initiated grand jury proceedings because of the plaintiff's criticism of them.  Barnes v. Wright, 449 F.3d 709 (6th Cir. 2006).  Barnes is more on point.  The court applied the Hartman rule despite acknowledging that "concerns regarding the intervening actions of a prosecutor do not apply in this case, because the officers themselves initiated the grand jury proceedings." But Barnes is not persuasive because the court stated only that the Hartman rule "sweeps broadly" without explaining why. Id. at 720.  In any event, Barnes is distinguishable because the claim in that case actually *was* "retaliatory prosecution":  the plaintiff in Barnes was

17

ultimately convicted of three misdemeanors.  This raises a concern similar to that in Hartman regarding "the presumption of prosecutorial regularity."  Again, no such concern is present in this case because all the charges against plaintiff were dismissed by the prosecutor.

In cases not involving the concerns raised in Hartman, courts have declined to extend its holding to claims for retaliatory arrests or other alleged police misconduct. E.g., Skoog v. County of Clackamas, 469 F.3d 1221, 1234 (9th Cir. 2006) (rejecting application of Hartman rule in claim for retaliatory arrest because "the retaliation claim in this case does not involve multi-layered causation as did the claim in Hartman"); Grassilli v. Barr, 48 Cal. Rptr. 3d 715, 732 (Cal. App. 4 Dist. 2006) ("Hartman is inapplicable to Grassilli's claims based on the traffic stops and citations because these claims and the damages sought were not based on criminal charges brought by a third party or entity against Grassilli."). Accordingly, I decline to apply Hartman in this case.

This is not to say that the existence or absence of probable cause is an unimportant fact to consider in an assessment whether an arrest or similar act was conducted for retaliatory reasons.  As the Court acknowledged in Hartman and I will discuss below, if an officer had probable cause for making an arrest, that tends to undermine an allegation that the arrest was fabricated, just as the absence of probable cause is strong evidence that the officer's true motive for the arrest was an illegal one.  But this is no different from any other

18

civil rights case in which the plaintiff's difficulty in proving his case varies depending on the evidence supporting the defendant's reason or reasons for taking the adverse act. It does not change the ultimate question, which is whether the defendant would have taken the same act in the absence of the plaintiff's protected conduct.

### B. Did Plaintiff Adduce Sufficient Evidence of a Retaliatory Motive?

1. Causation standard

The next issue raised by defendant is whether plaintiff has adduced sufficient evidence to permit a reasonable jury to find that defendant detained plaintiff and issued the citation to him because of plaintiff's political support for Bradner over Richards. Plaintiff has the initial burden to show that such support was a "motivating or substantial factor" in defendant's actions. Mt. Healthy, 429 U.S. at 287. (I have interpreted "motivating or substantial factor" to mean "one of the reasons" for the decision. Johnson v. Kingston, 292 F. Supp. 2d 1146, 1153-54 (W.D. Wis. 2003).) If plaintiff meets this burden, defendant has the burden to show that he would have acted the same way even if plaintiff had not supported a political opponent.

Plaintiff may meet his burden with direct evidence (which is not present in this case) or with circumstantial evidence, such as suspicious timing or evidence that defendant's stated reasons for his actions are false. E.g., Mullin v. Gettinger, 450 F.3d 280, 285 (7th Cir.

19

2006); <u>Massey v. Johnson</u>, 457 F.3d 711, 716-17 (7th Cir. 2006); <u>Culver v. Gorman & Co.</u>, 416 F.3d 540, 545-50 (7th Cir. 2005); <u>Hasan</u>, 400 F.3d at 1004.  Regardless of the method of proof the plaintiff chooses, the ultimate question on summary judgment is the same, which is whether a reasonable jury could find that the defendant retaliated against the plaintiff because of the exercise of a constitutional right.  <u>Carson v. Bethlehem Steel Corp.</u>, 82 F.3d 157, 159 (7th Cir.1996) ("Any demonstration strong enough to support judgment in the plaintiff's favor . . . will do, even if the proof does not fit into a set of pigeonholes.").

The question whether the plaintiff has adduced sufficient evidence regarding intent is a common one. The federal reporters are bursting at the seams with cases in which the court must consider whether the plaintiff has the type and quantum of evidence necessary to permit a jury to infer retaliation or discrimination.  In fact, it is rare to find a summary judgment opinion in a discrimination or retaliation case that does not include such a discussion.

One might think that because the question is nearly ubiquitous, the answer in a particular case would be obvious, requiring nothing more than the rote application of well established principles.  To be sure, courts have tried hard (perhaps a little too hard) to create frameworks with the purpose of making the determination more objective and structured. <u>E.g.</u>, <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973) (establishing framework for circumstantial evidence cases); <u>Thanongsinh v Board of Education</u>, 462 F.3d

20

762 (7th Cir. 2006) (altering framework in case in which plaintiff alleged that defendant's performance evaluations were discriminatory); Mills v. Health Care Service Corp., 171 F.3d 450, 457 (7th Cir.1999) (creating different test for discrimination cases brought by nonminority plaintiffs); Johnson v. Zema Systems Corp., 170 F.3d 734, 745 (7th Cir. 1999) (presumption of nondiscrimination arises when same person hired and fired plaintiff).

But these ever-proliferating standards, tests and presumptions sometimes complicate the question more than clarify it and can lead to seemingly inconsistent applications when a court believes that justice and the particular facts of a case require a modification of the rule. For example, in a recent discrimination case, the court of appeals jettisoned the requirement that a plaintiff using the "indirect method" must point to "similarly situated" individuals outside the plaintiff's group who received better treatment. Even though such a requirement has been imposed reflexively in countless cases over the years, the court retreated to a standard used in 1985 without overruling any cases decided in the interim. Pantoja v. American NTN Bearing Manufacturing Corp., 495 F.3d 840, 846 (7th Cir. 2007). (And since Pantoja, the court has returned to applying the "similarly situated" requirement. Bannon v. University of Chicago, No. 06-2955, – F.3d –, 2007 WL 2822383, *7 (7th Cir. Oct. 1, 2007).)

Perhaps the question of motive eludes easy resolution because each decision risks upsetting the precarious balance that a court must maintain regarding the competing

21

interests of the parties.  On the one hand, courts are aware of the significant financial and social costs that a trial imposes.  If a plaintiff's allegations are not supported, a defendant should not be subjected to the time, expense and potential public embarrassment that a trial may involve.  On the other hand, courts must proceed with great caution so that they do not invade the province of the jury.  Of course, a question of motive is a question of fact and case law is replete with admonishments to courts not to "weigh the evidence and determine the truth of the matter but rather [to] determine whether there is a genuine issue for trial." Lewis v. City of Chicago, 496 F.3d 645, 651 (7th Cir. 2007).  See also Winters v. Fru-Con Inc., 05-3911, – F.3d –, 2007 WL 2377386, *6 (7th Cir. Aug. 22, 2007); Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003).

But there is no clear line separating these two functions.  Every time a court determines that no "reasonable" jury could find discrimination or retaliation, it is in some sense weighing the evidence and deciding that the plaintiff has not placed on the scale "enough" suspicious items to tip the balance in favor of the plaintiff's Seventh Amendment right to a jury trial over the defendant's interest in being free from unfair litigation.   No matter how many rules courts adopt to assist in this task or how many cases they decide, they cannot eliminate the difficulties of the task or what many may see as its inherently subjective nature.

It is with these considerations in mind that I turn to the question whether plaintiff

22

has adduced sufficient evidence of improper motive.  As with most cases that are not settled before summary judgment, plaintiff has no smoking gun: there are no shocking admissions from defendant or foolish missteps on his part making inescapable the conclusion that he targeted plaintiff because of his support for a political opponent.  But there can be no serious argument regarding whether the manner in which he conducted the stop was suspicious, if not downright bizarre.  I conclude that these undisputed facts combined with the significant disputes between the parties regarding what they said and did during the stop are sufficient to allow plaintiff to present his claims to a jury.

2.  Plaintiff's evidence of retaliation

        The parties agree that plaintiff satisfies the threshold question for a motive analysis, which is whether defendant knew about plaintiff's exercise of a constitutional right.  Morfin, 349 F.3d at 1005 ("The protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity.")  Defendant was aware of plaintiff's support for an opposing candidate as a result of the sign in plaintiff's car and because of previous knowledge defendant possessed about plaintiff's involvement in the Bradner campaign.  In fact, defendant admits that during the stop he was thinking about his and plaintiff's opposing positions in the upcoming election.

a.  Absence of probable cause

Turning to the evidence plaintiff has adduced, I begin with the question whether defendant had probable cause to hold plaintiff and issue to him the citation for public urination. I conclude that a genuine dispute exists on that question.  (In his proposed findings of fact, defendant alludes to three violations he may have suspected plaintiff of committing: trespassing, damaging property and public urination.  However, the public urination charge is the only charge for which he argues he had probable cause or even reasonable suspicion, so I limit my consideration to that issue.)

Unfortunately for defendant, the only evidence that supports a finding of probable cause is disputed.  Defendant admits that he did not see plaintiff urinating and that he did not later discover any evidence that plaintiff had done so, such as wet ground.  Rather, the sole piece of evidence on which defendant relies is plaintiff's alleged admission that he had urinated behind the sign. Of course, an admission would be more than adequate to support a finding of probable cause, but plaintiff denies that he ever made such an admission.  As defendant is well aware, in deciding a motion for summary judgment, I must accept as true plaintiff's version of events, Hemsworth v. Quotesmith.Com, Inc., 476 F.3d 487, 489 (7th Cir. 2007), which means I must assume that defendant did not have probable cause to believe that plaintiff had done anything that would justify detaining him and issuing a citation to him.

24

In his brief, defendant argues that the court must declare plaintiff's denial to be incredible as a matter of law because plaintiff gave inconsistent testimony in his deposition. Of course, in most instances, the credibility of a particular witness is for the trier of fact to determine.  Turner v. Miller, 301 F.3d 599, 604 (7th Cir. 2002).  Thus, when a witness gives contradictory testimony at trial, it is a relevant consideration for the jury, but it is not a ground for striking the testimony or declaring the witness incompetent to testify on the matter.  United States v. Cook,  949 F.2d 289, 293 (10th Cir. 1991).

Defendant is correct to point out that the court of appeals has adopted a different approach for summary judgment.  The general rule is that "a party cannot defeat summary judgment by having a witness contradict her own prior deposition testimony."  Patton v. MFS/Sun Life Financial Distributors, Inc.,  480 F.3d 478, 488 (7th Cir. 2007).  Although the court has never explained the source of its authority to make this credibility determination, the purpose of the rule is to "wee[d] out clearly unmeritorious cases," on the understanding that "the change [in testimony] is often a transparent ruse designed to prolong the case."  Id.

Whatever the rule's justification, it does not apply to plaintiff's testimony in this case. First, as a general matter, the rule has been limited "sham *affidavits*," in which a party attempts to contradict without explanation earlier deposition testimony.  E.g., Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 759 (7th Cir. 2006); Piscione v. Ernst & Young, L.L.P.,  171

F.3d 527, 532 (7th Cir.1999).  The rationale for the rule appears to be that affidavits are less reliable than depositions because they are not subject to cross examination and because they are often drafted by the lawyer rather than the affiant.  <u>Russell v. Acme-Evans Co.</u>, 51 F.3d 64, 67-68 (7th Cir. 1995).  In this case, the discrepancy on which defendant relies comes from different parts of the same deposition, so the rationale for the rule does not apply.

Perhaps more important, the court of appeals has admonished district courts not to disregard testimony unless the contradiction is unmistakably clear.  <u>Patton</u>, 480 F.3d at 488 (question is whether later testimony is "plainly incredible").  Defendant does not point to testimony in which plaintiff said, "I told officer Ott that I urinated behind the sign," or anything remotely similar.  Rather, defendant relies entirely on a statement by plaintiff at the beginning of the deposition in which he said, "Right at this point, I can't say, no" in response to a question whether a report prepared by Kuhl was inaccurate.  Dkt. #14, at 13.  The 14-page single-spaced report includes the following sentence: "Gullick stated that he had advised Deputy Ott that he had gone up to the location in the ditch to urinate."  Aff. of Kinne, dkt. #28, exh. A, at 1.

Plaintiff's deposition statement is equivocal to say the least.  First, it is not clear whether plaintiff meant to say, "No, there is nothing inaccurate in the report" or "I can't say that nothing is inaccurate in the report."  Even if it was the former, the report itself is equivocal because the statement is that plaintiff went to the ditch to urinate, not that he had

actually done so.  In another passage of the report, Kuhl wrote that plaintiff "never did state [to defendant] that he had actually urinated."  <u>Id.</u> at 4.  Further, when plaintiff was asked directly during his deposition whether he had made that statement in the report on which defendant now relies, plaintiff denied that he had.  Dkt. #14, at 24-25.  And when asked about the conversation he had with defendant during the stop, plaintiff testified that he told defendant only that he "really needed to go to the bathroom."  <u>Id.</u> at 33.   Whatever discrepancies exist in plaintiff's testimony, I cannot conclude that it is "plainly incredible." Therefore, I must assume that plaintiff did not admit to violating the ordinance and that defendant did not have probable cause to believe that plaintiff had engaged in unlawful activity.

As the Court recognized in <u>Hartman</u>, 547 U.S. at 261, the absence of probable cause is "highly valuable circumstantial evidence" and "apt to prove . . . retaliatory causation." Therefore, this dispute is enough by itself to raise a genuine dispute regarding the larger question whether defendant held plaintiff and issued a citation to him because of his affiliation with a particular candidate.


b.  Other evidence

Several other facts support the drawing of an inference that defendant did not have a legitimate motive for holding plaintiff and issuing the citation to him.  The first is the

search for "negative fliers" that defendant conducted of plaintiff's car.

Defendant has no explanation for conducting the search. As should be obvious to any police officer, possessing fliers is not illegal, no matter how "negative" they are. Thus, regardless whether defendant obtained plaintiff's consent for the search, defendant's motives for conducting it are questionable, which makes the entire stop more suspicious.

It is true that the idea for the search came from another officer, Randy Martin, but this does little to help defendant. First, Martin, who was another Richards supporter, was not a Columbia County officer and had no authority over defendant. It is not even clear why defendant was communicating with Martin at all. Second, defendant followed Martin's suggestion blindly, without asking any questions or seeking any further information. It is reasonable to infer that if defendant had reasons for the search other than harassment, he would have tried to find out more about its purpose. (In his responses to plaintiff's proposed findings of fact, defendant attempts to make Martin's request appear more reasonable by citing portions of Martin's deposition in which he provides context for the request. However, I cannot consider this background information because defendant cites no evidence that *he* was aware of any of it when he decided to conduct the search. The facts show only that Martin made the suggestion and defendant followed through with it.)

In his police report, defendant attempted to justify the search for fliers as a way to show that plaintiff had damaged the Richards sign, but this is a perplexing justification.

28

Defendant does not explain in his police report or in his proposed findings of fact how the possession of fliers could be evidence of property damage and I see no reasonable connection between the two.  This only further supports plaintiff's view that defendant was on a fishing expedition, eagerly looking for a violation wherever he could find it.

Second, the stop lasted more than one hour, which is an unusually long time to issue a citation for a forfeiture.  What's worse, defendant cannot explain why the stop took as long as it did.  He told his supervisor that he wanted to be "thorough" because he knew that the case would be closely scrutinized as a result of his and plaintiff's opposing political affiliations.  But this admission hurts defendant more than it helps him because he does not point to any examples of his "thoroughness."  Although defendant says he suspected plaintiff of three different violations (trespassing, damage to property and public urination), the facts show little to no investigation during the stop of any of these potential violations.  Defendant's own supervisor told him that the stop took "far too long" for the amount of investigation he conducted.  According to defendant's own proposed findings of fact, his only activity after making a short call to dispatch was to send and receive messages of questionable relevance about plaintiff on his computer.

It does not help defendant that plaintiff has proposed facts suggesting that defendant prolonged the stop intentionally because plaintiff told him that he needed to use the bathroom as a result of a medical condition causing sudden urges to urinate.  Although

defendant denies plaintiff said anything about this, again, I must accept plaintiff's version of the story.

Next, according to defendant's supervisor, defendant stated initially that he did not believe that plaintiff had violated the public urination ordinance.  Dkt. #28, exh. 1, at 4. Of course, if defendant did not actually believe that plaintiff violated the law for which defendant cited him, it does not take much of a leap to infer that the true reason for the citation was the one defendant admits was on his mind during the stop: plaintiff's support for Bradner.

A related question is whether defendant had ever before cited someone else for urinating in a rural area.  Many might be surprised to learn that such conduct was illegal at all, much less that the law was being enforced in a cornfield.  If plaintiff was the only person being cited for similar conduct, this would support a belief that plaintiff was being targeted for his political affiliation.  The fact that defendant had to search for the ordinance before citing plaintiff lends supports to a view that defendant did not issue many citations for public urination.

Viewing the facts in the light most favorable to plaintiff, I must assume that defendant did not have probable cause to issue the citation to plaintiff, that he did not believe plaintiff had violated the public urination ordinance, that he prolonged the stop for an hour without good reason (even though plaintiff was pleading to leave to use the

bathroom) and that he conducted a groundless search of plaintiff's car.  This is sufficient to allow a reasonable jury to find that plaintiff's support for a political opponent was one of the reasons that defendant held plaintiff and issued a citation to him and that defendant would not have taken the same actions if plaintiff had been a Richards supporter.

### C.  Was Plaintiff's Injury "Trivial"?

Defendant's third argument is his weakest, which is that the injury plaintiff suffered is not sufficient to trigger the protections of the First Amendment.  Although I would not go as far as to say that defendant's argument is frivolous, when one reviews the relevant law on this question, it is clear that defendant's view cannot prevail.

Defendant starts out wrong by assuming that plaintiff cannot prevail unless he can show that he was actually deterred by defendant from exercising his First Amendment rights.  Because plaintiff filed a complaint with the Columbia County sheriff's office almost immediately after the stop, defendant says, he was not actually chilled by defendant's conduct and cannot claim an injury.  But accepting this argument would place victims of retaliation in a Catch-22 situation, as I noted recently in the context of a retaliation claim brought under the right of access to the courts:

> It should be obvious that the standard [for determining an injury under the First Amendment] does not bar relief to a plaintiff simply because he refused to be deterred.  Otherwise, a claim involving retaliation for exercising the right of access to

31

the courts would be impossible to win.  A person who brought a lawsuit would by definition show that he could not prevail on his claim because the lawsuit itself would be conclusive evidence that he was not deterred.  At the same time, however, a victim of retaliation who did not file a lawsuit would be without a legal remedy as well. Thus, the question is not whether the *plaintiff* was actually deterred, but whether "the harassment is so trivial that a *person of ordinary firmness* would not be deterred from" exercising his constitutional rights.  Pieczynski v. Duffy, 875 F.2d 1331, 1333 (7th Cir. 1989) (emphasis added).

Hennings v. Ditter, No. 06-C-353-C, 2007 U.S. Dist. LEXIS 41746 (W.D. Wis. June 7, 2007).  See also Thomas v. Eby, 481 F.3d 434, 441 (6th Cir. 2007) ("we totally reject the argument that the later filing of complaints or grievances against challenged action demonstrates that the challenged action was not sufficiently adverse to constitute adverse action").  In other words, unless First Amendment protections against retaliation are to become completely illusory, a victim cannot lose his right to bring a lawsuit simply by previously complaining that his rights had been violated.

Thus, the only question is whether defendant's treatment of plaintiff is too "trivial" to be deemed an injury under the First Amendment.  Examples of harassment that the court of appeals has held to be sufficiently adverse include disciplinary warnings, Pantoja, 495 F.3d at 849, reprimands, Yoggerst v. Stewart, 623 F.3d 35, 39 (7th Cir. 1980) and even "ridicule for bringing a birthday cake to the office," Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982).  See also Thomas v. Ragland, 324 F. Supp. 2d 950 (W.D. Wis. 2004) (initiating disciplinary investigation at work sufficiently adverse).

In this case, plaintiff was held against his will for more than an hour, all the while not knowing whether he would be arrested (and, he says, while having a strong urge to go to the bathroom).  In addition, he received a public urination citation that was likely to (and did) cause significant embarrassment.  These are not trivial slights, particularly when one considers the power differential between plaintiff and defendant.  It cannot be ignored that defendant is a police officer, which gives him absolute authority over ordinary citizens like plaintiff and makes any adverse acts he takes more likely to have a chilling effect.  Power v. Summers, 226 F.3d 815, 820 (7th Cir. 2000) (question whether act is sufficiently "adverse" should be decided in context of circumstances of particular case); see also Burlington Northern and Santa Fe Railway Co. v. White,  126 S. Ct. 2405, 2415 (2006) (stating that "[c]ontext matters" in determining whether act is sufficiently adverse to support retaliation claim under Title VII, which employs almost identical standard to claims under First Amendment).  Although I need not go as far as to say that any exercise of authority by an officer would deter a person of ordinary firmness, I have no difficulty in saying that defendant's actions pass the test in this case.

## D.  Is Defendant Entitled to Qualified Immunity?

The final issue is whether defendant is entitled to qualified immunity, which grants individual defendants immunity from suit under § 1983 unless they had "fair warning" that

33

they were violating the law as it existed at the time of the events giving rise to the lawsuit. Hope v. Pelzer, 536 U.S. 730, 739 (2002); Alexander v. City of Milwaukee, 474 F.3d 437, 443 (7th Cir. 2007).  In other words, the question is whether the defendant made a decision "that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Brosseau v. Haugen,  543 U.S. 194, 198 (2004).

Defendant's qualified immunity argument focuses on two issues, the first of which is the dearth of case law addressing retaliation by police officers.  Although pointing to a case directly on point is one way a plaintiff may overcome a defense of qualified immunity, Wilson v. Layne,  526 U.S. 603, 617 (1999), the Supreme Court and the court of appeals have made it clear that it is not the only way. Hope, 536 U.S. at 741; McGreal v. Ostrov, 368 F.3d 657, 683 (7th Cir. 2004); Nabozny v. Podlesny, 92 F.3d 446, 456 (7th Cir. 1996) ("liability is not predicated upon the existence of a prior case that is directly on point").  If a reasonable officer looking at the law as it existed at the time would know that his conduct was unconstitutional, that is enough.

The court of appeals has observed on multiple occasions that it is clearly established as a general matter that public officials may not retaliate against citizens for exercising their constitutional rights. Pearson v. Welborn,  471 F.3d 732, 741 (7th Cir. 2006); DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir.2000) ("An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution.").  Although it is true that a

34

qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), there is no hint in the case law that the First Amendment does not apply to police officers or that the general framework for analyzing a First Amendment retaliation claim applies differently to police officers than to other officials.  To the contrary, in the few cases in which the court of appeals has considered a First Amendment retaliation claim against a police officer, the court has applied the same standard as any other case.  <u>E.g.</u>, <u>Morfin</u>, 349 F.3d at 1005-06; <u>Ryan v. County of DuPage</u> 45 F.3d 1090, 1094 (7th Cir. 1995).

Although defendant does not articulate it clearly, he may mean to argue that <u>Hartman</u> muddied the waters enough to permit a reasonable officer to believe that he could retaliate against citizens with impunity, so long as he had probable cause for whatever actions he took.  Although I find this argument dubious for the reasons discussed in Part A of this opinion, I need not resolve it at this time because there is a genuine dispute whether defendant had probable cause to believe that plaintiff had violated the public urination ordinance.  As with all other inquiries on summary judgment, in determining whether defendant is entitled to qualified immunity, I must accept the facts as plaintiff alleges them. <u>Miller v. Jones</u>, 444 F.3d 929, 935 (7th Cir. 2006).

Defendant's second argument on qualified immunity is that as of August 2006 no law clearly established that his conduct was sufficiently serious to constitute retaliation under

the First Amendment.  This argument is not persuasive because the court of appeals concluded long before 2006 that conduct significantly less serious than defendant's was sufficiently adverse to trigger First Amendment protections, as I discussed in Part C of the opinion.  Any reasonable officer would have known in August 2006 that he could not detain someone and issue a citation to him simply because he supported a candidate the officer did not like.  If plaintiff can prove at trial that is what defendant did, defendant will not be entitled to qualified immunity.

ORDER

IT IS ORDERED that defendant Terry Ott's motion for summary judgment is DENIED.

Entered this 9th day of October, 2007.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

36